**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEBRASKA**

FILED
U.S. DISTRICT COURT
DISTRICT OF NEBRASKA

2017 MAY 26 AM 9: 42

OFFICE OF THE CLERK

MARC J. MURI, individually and on behalf of
all others similarly situated,

Case No.: 8:17CV178 — pd

Plaintiff,

v.

Jury Trial: Yes

NATIONAL INDEMNITY COMPANY,

Defendant.

---

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF
## THE EMPLOYEE RETIREMENT INCOME SECURITY ACT

---

1.     Plaintiff Marc J. Muri ("Plaintiff"), by and through his attorneys, on behalf of himself and all others similarly situated, based on personal knowledge with respect to his own circumstances and based upon information and belief pursuant to the investigation of his counsel as to all other allegations, asserts as follows:

### I. INTRODUCTION

2.     National Indemnity Company ("NICO" or "Defendant") is an insurance company and the oldest subsidiary of well-known Berkshire Hathaway, the insurance and financial services conglomerate founded by Berkshire Hathaway's CEO Warren Buffett ("Buffett"). NICO has approximately 2,000 employees who participate in the "National Indemnity Company Employee Retirement Savings Plan" (the "NICO Plan" or the "Plan"). The Plan offers a vehicle for employees to invest a portion of their earnings on both a pre-tax and post-tax basis towards their retirement.

3.     The NICO Plan is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). ERISA is a landmark federal law enacted to promote the interests of employees and their beneficiaries. It seeks to protect contractually defined benefits owed to those employees and beneficiaries. To that end, the statute imposes stringent duties on plan fiduciaries. *See* ERISA § 404, 29 U.S.C. § 1104 (establishing standard of care); 29 C.F.R. § 2550 (Department of Labor rules and regulations for fiduciaries). These fiduciary duties are among the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). ERISA also gives participants and their beneficiaries the right to sue breaching fiduciaries to recover losses on behalf of the plan. ERISA § 409; 29 U.S.C. § 1109 (breaching fiduciaries "shall be personally liable to make good"); ERISA § 502; 29 U.S.C. § 1132 (creating right of action to enforce 29 U.S.C. § 1109).

4.     Plaintiff is a participant in the NICO Plan. The NICO Plan is "participant-directed," that is, the Plan participants choose where to put their money based on the investment options which the Plan makes available.

5.     NICO, both as the "Named Fiduciary" of the Plan and under ERISA, had a responsibility to prudently select and monitor the retirement investment options available to the Plan participants.

6.     This case is simple. Defendant invested NICO Plan assets in The Sequoia Fund (the "Fund"), a high-cost mutual fund run by Adviser Ruane, Cunniff & Goldfarb ("Ruane Cunniff") and its Portfolio Managers, Robert D. Goldfarb and David M. Poppe (collectively, the "Fund Managers").

7.     Throughout 2015—in violation of the Fund's investment policies and despite the concerns of Fund shareholders—the Fund Managers concentrated the Fund's assets in a single

2

stock, Valeant Pharmaceuticals, Inc. ("Valeant"). The Fund was the largest shareholder in Valeant in 2015, owning nearly 10 percent of Valeant. And Valeant represented more than 30 percent of the Fund's total assets.

8.      Valeant had a well-known reputation for misleading investors with faulty accounting and profit expectations and gouging consumers in the sale of pharmaceuticals. In the process, Valeant had earned a nickname "the Pharmaceutical Enron," which subsequently turned out to be all-too-true for its investors, including the Fund and, through it, the Plan and its participants.

9.      Plaintiff and other Plan participants traditionally had limited investment options under the Plan and with most of those options being the Plan Trustee's (defined *infra*) proprietary fund; this left virtually only five investment options, including the Fund. The Fund had a close relationship with Berkshire Hathaway's senior officers and it was one of the largest stockholders of Berkshire Hathaway—NICO's parent company. The Fund was managed by lifelong friends of Buffett, who is a famous disciple of "value investing."

10.     Moreover, NICO intentionally steered Plan funds to the Fund by directing that all of the Plan's unallocated accounts, as well as all participant forfeitures, be invested "[o]ne hundred percent in" the Fund. In an uncomfortably conflicted relationship, NICO strongly favored the Fund because it, in turn, invested heavily in Berkshire Hathaway stock, and NICO therefore sought to keep the Plan heavily invested in the Fund over competitive alternatives that were not made available to Plan participants.

11.     As a result, by January 2015, the Fund was the Plan's largest holding by a substantial margin. NICO, as the "Named Fiduciary," should have been closely monitoring and reviewing the Fund for continued prudence and compliance with ERISA standards.

3

12.     In October 2015, despite the warning signs and the Fund's already concentrated position in Valeant, the Fund Managers bought *even more* shares of Valeant for the Fund. On May 31, 2016, the Fund announced that it had finally sold half of its holdings in Valeant, reducing its ownership of the company to under five percent, but by that point Valeant's stock had already dropped by over 88 percent in less than a year. Valeant's stock price has dropped substantially further since then.

13.     Because of its concentration in Valeant and its fees, the Fund underperformed its benchmark, the S&P 500 Index, by 6.14% in 2014, 8.68% in 2015, and 15.17% from January 1 through June 15, 2016.

14.     Despite these violations of the Fund's investment policies, public warnings, high fees and poor performance, Defendant has invested, and continues to invest, a significant portion of the Plan's assets in the Fund.

15.     NICO breached its duties and failed to monitor the Fund. The Fund grossly deviated from its prospectus and its investment restrictions; it *massively* invested in a high-risk, highly volatile stock, Valeant, with dubious accounting and a suspect business model. At one point, roughly 30 percent of the Fund was invested in Valeant.

16.     By January 2015, the Fund was no longer prudent for the Plan, either as an investment for participants with new contributions or as a holding for retirement money. No prudent fiduciary under ERISA should have continued to offer the Fund or kept it in the Plan. NICO, as the Plan's fiduciary, was required to take action to prevent harm to the Plan and participants.

17.     NICO, however, did nothing. NICO failed even to warn Plan participants about the fundamentally and materially different risk profile and nature of the Sequoia Fund. As a result

4

of NICO's lack of prudent action, Plaintiff and other Plan participants were significantly damaged when Valeant stock eventually cratered, causing the Sequoia Fund steep losses in value. The Plan and its participants have suffered at least tens of millions of dollars in losses that were avoidable had they chosen other prudent investment alternatives.

18.     This case concerns Defendant's imprudent management of the Plan's assets by failing to remove the Fund from the Plan when it became apparent that the Fund was no longer a suitable investment for participants' retirement savings. Defendant was required by ERISA to exercise due care, skill, prudence and diligence when making decisions with respect to selecting, removing, replacing and monitoring the Plan's investments. Defendant's fiduciary duties are among the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). Consistent with these fiduciary duties, Defendant was obligated to offer only prudent investment options. A fiduciary has "a continuing duty of some kind to monitor investments and remove imprudent ones" and "a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015). In violation of these duties, Defendant selected and repeatedly failed to remove or replace the Fund.

19.     As more fully set forth below, Defendant breached its fiduciary duties owed to the Plan and its participants, including those fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and Department of Labor ("DOL") Regulations, 29 C.F.R. § 2550. As a result of these breaches, Defendant is liable to the Plan for all losses resulting from each such breach of fiduciary duty. Plaintiff also seeks equitable relief.

20.     Plaintiff's First Cause of Action alleges that it was imprudent of Defendant to permit the Plan to maintain the Fund as an investment option as the Fund became increasingly

5

concentrated in Valeant and less diversified in 2015 in violation of prudent retirement plan management. Plaintiff's Second Cause of Action alleges that Defendant breached its fiduciary duty of loyalty by permitting the Plan to maintain, and offer to participants, an investment option plagued by conflicts of interest.

21.     Moreover, public information demonstrated that the Fund was an extremely risky investment which was imprudent for the investment of retirement assets. Specifically, the Fund was violating its investment policies by highly concentrating its assets in the common stock of Valeant despite numerous warnings that Valeant relied on an uncertain business model whose price was artificially inflated by questionable accounting practices.

22.     Defendant allowed the imprudent investment of the Plan's assets in the Fund throughout the period from January 1, 2015 through the date of judgment in this action (the "Class Period") despite the fact that Defendant knew or should have known that the Fund was an imprudent investment. A prudent fiduciary would have recognized that, as a consequence of the public information about the riskiness of the Fund, the Plan's significant investment of employees' retirement savings in the Fund would very likely result in devastating losses to the Plan and, consequently, to the Plan's participants.

23.     Plaintiff brings this action on behalf of the Plan and seeks to recover losses to the Plan resulting from Defendant's breaches of its fiduciary duties pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132. Because Plaintiff's claims apply to the Plan, inclusive of all participants with accounts invested in the Fund during the Class Period, and because ERISA specifically authorizes participants such as Plaintiff to sue for relief for the Plan for breaches of fiduciary duty such as those alleged herein, Plaintiff brings this lawsuit on behalf of the Plan and all participants and beneficiaries of the Plan during the proposed Class Period.

6

## II. JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

25.     Venue is proper in this district under ERISA §502(e)(2), 29 U.S.C. § 1132(e)(2),

because the Plan was administered in this district and some or all of the fiduciary breaches for

which relief is sought occurred in this district.

## III. PARTIES

### A.     Plaintiff

26.     Plaintiff Marc J. Muri is a NICO Plan participant within the meaning of ERISA

§ 3(7), 29 U.S.C. § 1102(7). He purchased and held shares of the Fund in his NICO Plan retirement

savings account during the Class Period.

27.     Plaintiff brings this action on behalf of a class of all participants in the Plan whose

retirement assets were invested in the Fund during the Class Period.

### B.     Defendant

28.     Defendant NICO is a corporation with its principal place of business in Omaha,

Nebraska.  Under the Plan, NICO is both the "Named Fiduciary" and Plan Administrator.  As

such, NICO has fiduciary responsibilities and duties for the Plan's management, operation and

administration.

29.     Before filing this action, Plaintiff served a request pursuant to 29 U.S.C.

§1024(b)(4) to obtain the identities of any people at NICO who were carried out the NICO's

responsibilities as the Plan's Named Fiduciary.  Plaintiff also requested all documents relating to

reviews, evaluations and investment decisions concerning the Fund.  The Plan Administrator

refused to identify the relevant people or to provide documents or information about evaluations

and decisions concerning the Fund.

7

## IV. KEY FEATURES OF THE NICO PLAN

30. As discussed *infra*, the NICO Plan is governed by ERISA. ERISA distinguishes between "defined benefit plans" and "defined contribution plans." *Compare* ERISA § 3(35), 29 U.S.C. 1002(35) (defining the term "defined benefit plan") *with* ERISA § 3(34), 29 U.S.C. § 1002(34) (defining the term "defined contribution plan" or "individual account plan").[1]

31. The NICO Plan is an individual account plan. It provides individual accounts for each participant and pays benefits based solely upon the amount contributed to the participant's account and any income, expenses, gains and losses, or forfeitures allocated to it. As with any such plan, benefits in the NICO Plan fluctuate with changes in the value of the investments in the individual's account. By contrast, a defined benefit plan promises a specific monthly benefit, either as an exact dollar amount or as an amount calculated based on factors such as salary and years of service.

32. The NICO Plan permits participants themselves to select from a menu of funds in which to invest their individual contributions. Accordingly, the NICO Plan is "participant-directed" as defined by the DOL.[2]

33. Under the NICO Plan, the Plan participants contribute through deductions to their earnings and receive a matching contribution by NICO. They have the option of contributing on both a pre-tax or post-tax basis.

---

[1]    *See also generally* U.S. Dep't of Labor, *Types of Retirement Plans*, https://www.dol.gov/general/topic/retirement/typesofplans.

[2]    *See Fact Sheet: Final Rule to Improve Transparency of Fees and Expenses to Workers in 401(k)-Type Retirement Plans*, U.S. Dep't of Labor, Emp. Benefits Sec. Admin. (Feb. 2012), https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/fsparticipantfeerule.pdf ("A 'participant-directed plan' is a plan that provides for the allocation of investment responsibilities to participants or beneficiaries.").

## V. DEFENDANT'S FIDUCIARY STATUS UNDER ERISA

34.     ERISA requires every plan to provide for one or more "Named Fiduciaries" who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

35.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under section 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who perform fiduciary functions.  A person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

36.     Under the Plan, NICO is both the "Named Fiduciary" and Plan Administrator responsible for the investment options.  NICO retained this power as employer to direct the investment options available under the Plan.  In fact, on several occasions, NICO has issued "Plan Investment Directions" to the Trustee,[3] directing changes to the investment fund offerings under the Plan to participants.  As such, NICO had responsibility and authority for the investment options offered and available to the Plan participants including the Sequoia Fund.

---

[3]     At all relevant times during the Class Period Wells Fargo Bank, N.A. served as the Plan's nondiscretionary (directed) Trustee.

## VI.  DEFENDANT'S FIDUCIARY OBLIGATIONS UNDER ERISA

37.     ERISA imposes strict fiduciary duties upon plan fiduciaries. For example, section 404(a)(1)(B) of ERISA imposes on every plan fiduciary the duty of prudence—that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . ." *See* 29 U.S.C. § 1104(a)(1)(B).

38.     ERISA also imposes on a plan fiduciary the duty of loyalty—that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . ." *See* ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).

39.     The duty of loyalty requires a fiduciary to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

40.     When an ERISA plan, like the NICO Plan, offers participants the opportunity to invest in retirement funds, the duties of prudence and loyalty dictate that the plan's fiduciary has an ongoing duty to monitor the plan's investment options to ensure that they are suitable for the Plan. *See Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).  Accordingly, "a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1829.

10

## VII. DEFENDANT'S FIDUCIARY BREACHES

### A.    The Fund and Its Violation of Its Own Investment Policies

41.     The Fund is an open-end mutual fund managed by the Fund Managers.

42.     The Fund provides reports to its shareholders in June and December each year.
The Fund also reports its portfolio holdings in March and September each year in Form N-Q
filings with the Securities and Exchange Commission.  Defendant, in the exercise of its Plan
duties, knew or should have known the content thereof and should have reviewed these documents
for red flags.

43.     The Investment Company Act of 1940 (the "1940 Act") provides that a mutual
fund's registration's statement must recite all investment policies that can be changed only by
shareholder vote. *See* 15 U.S.C. § 80a-8(b).  The Fund's investment policies were adopted and
subsequently incorporated in its Registration Statement and its Prospectus.

44.     The Fund's Prospectus stated that it would invest in stocks "when the price appears
low in relation to the value of the total enterprise" and that it "typically sells the equity security of
a company when the company shows deteriorating fundamentals, its earnings progress falls short
of the investment adviser's expectations or its valuation appears excessive relative to its expected
future earnings" (the "Sell Strategy").

45.     Although it was a "non-diversified" mutual fund, at all relevant times the Fund
adopted a policy to limit the percentage of its total assets that were invested in one industry (the
"Concentration Policy"). The Concentration Policy states that the Fund may not:

> Concentrate investments in an industry, as concentration may be defined under the
> 1940 Act or the rules and regulations thereunder (as such statute, rules or
> regulations may be amended from time to time) or by guidance regarding,
> interpretations of, or exemptive orders under, the 1940 Act, or the rules or
> regulations thereunder published by appropriate regulatory authorities.

11

*See, e.g.*, Sequoia Fund's 2016 Statement of Additional Information, available at: http://www.sequoiafund.com/prospectus_files/SAI16.pdf.

46.     Form N-1A, the registration form for open-end mutual funds like the Fund, reflects the SEC's long-standing view that "25% is an appropriate benchmark to gauge the level of investment concentration that could expose investors to additional risk," and thus "a fund investing more than 25% of its assets in an industry is concentrating in that industry." *See* 1998 Release, 63 Fed. Reg. at 13927.

47.     Moreover, the 1998 Release rescinded earlier SEC guidance that had suggested that this 25% limit would only pertain to a fund's concentration at the time of purchase; by 1998, the SEC renounced that position. Indeed, the SEC affirmatively stated that the earlier guidance "may encourage generic disclosure about fund operations," was "not organized in the most useful or effective manner" and was "outdated." *See* 63 Fed. Reg. 13916; *see also In re Charles Schwab Corp. Sec. Litig.*, No. 08-cv-01510 WHA, 2010 WL 1261705, at *3, 6 (N.D. Cal. Mar. 30, 2010) (mutual fund violated Investment Company Act by investing more than 25% of holdings in one industry, and noting that SEC's earlier guidance on this issue was "now-withdrawn"). Accordingly, the Concentration Policy prohibited the Fund from investing 25% or more of the fund's total assets in any single industry, and the Fund flagrantly violated that Policy through its single-minded investment in Valeant.

48.     The 1940 Act expressly prohibits a mutual fund like the Fund from "deviat(ing) from its policy in respect of concentration in investments in any particular industries or group of industries . . . ." *See* 15 U.S.C. § 80a-5(b).

12

49.    The Fund's 2015 Prospectus also set forth the Fund's strategy of selling assets that are no longer believed to have "fundamental value" (the "Value Policy"). The 2015 Prospectus stated:

> The Fund's investment objective is long-term growth of capital. In pursuing this objective the Fund focuses principally on common stocks it believes are undervalued at the time of purchase and have the potential for growth. A guiding principal in the consideration of common stocks as units of ownership of a business and the purchase of them when the price appears low in relation to the value of the total enterprise. No weight is given to technical stock market studies. The balance sheet and earnings history and prospects of each investment are extensively studied to appraise fundamental value industries . . . ." *See* 15 U.S.C. § 80a-5(b).

*See* 2015 Prospectus dated May 1, 2015 at 1-2, available at: http://www.sequoiafund.com/prospectus_files/Pros15.pdf.

50.    The Value Policy also states that the Fund:

> typically sells the equity security of a company when the company shows deteriorating fundamentals, its earnings progress falls short of investment adviser's expectations or its valuation appears excessive relative to its future earnings.

*Id.* at 2.

51.    As of December 31, 2014, the Fund held 11,281,224 shares of Valeant stock. The Fund's holdings in Valeant as of December 31, 2014, accounted for 20% of the Fund's total net assets. *See* Annual Report dated December 31, 2014, available at: http://www.sequoiafund.com/Reports/Annual/Ann14.pdf.

52.    As of March 31, 2015, the Fund held 11,281,224 shares of Valeant stock worth $2,240,676,711, accounting for more than 26% of the Fund's total net assets. *See* Sequoia Fund's Form N-Q at Item 1, Schedule of Investments as of March 31, 2015. Thus, with Valeant *alone*, the Fund was violating its Concentration Policy as of *at least* March 31, 2015.

53.    As of June 30, 2015, 28.7% of the Fund's assets were invested in Valeant stock and 30% of the Fund's assets were invested in stocks in the healthcare industry.

13

*See* Semi-Annual Report, dated June 30, 2015, available at:
http://www.sequoiafund.com/Reports/Quarterly/SemiAnn15.pdf.

54.     These levels of concentration in a single security are too high for any mutual fund that is a retirement plan investment option, but they are especially egregious in light of the security here, Valeant. By comparison, the table below shows the largest holdings in each of the ten most common large-cap domestic stock funds in 401(k) plans,[4] according to the latest reports available to Morningstar, a third-party mutual fund research service.

| Fund | Largest Holding | Percent of Total Fund |
|------|-----------------|----------------------|
| VINIX[5] | Apple | 3.71% |
| FCNTX[6] | Facebook | 6.65% |
| FUSEX[7] | Apple | 3.68% |
| FDGRX[8] | Apple | 5.51% |
| DODGX[9] | Bank of America Corp. | 4.04% |
| VFINX[10] | Apple | 3.70% |
| AGTHX[11] | Amazon.com | 6.66% |
| VPMCX[12] | Biogen | 4.82% |

---

[4] Nellie S. Huang, *101 Most Popular Funds for Retirement Savers*, Nasdaq (Mar. 2, 2015), http://www.nasdaq.com/article/101-most-popular-mutual-funds-for-401k-savings-cm450291.

[5] Morningstar, *Vanguard Institutional Index I*, MORNINGSTAR, http://www.morningstar.com/funds/XNAS/VINIX/quote.html (last updated Mar. 31, 2017).

[6] Morningstar, *Fidelity Contrafund*, MORNINGSTAR, http://www.morningstar.com/funds/xnas/fcntx/quote.html (last updated Mar. 31, 2017).

[7] Morningstar, *Fidelity 500 Index Investor*, MORNINGSTAR, http://www.morningstar.com/funds/xnas/fusex/quote.html (last updated Mar. 31, 2017).

[8] Morningstar, *Fidelity Growth Company*, MORNINGSTAR, http://www.morningstar.com/funds/xnas/fdgrx/quote.html (last updated Mar. 31, 2017).

[9] Morningstar, *Dodge & Cox Stock*, MORNINGSTAR, http://www.morningstar.com/funds/xnas/dodgx/quote.html (last updated Mar. 31, 2017).

[10] Morningstar, *Vanguard 500 Index Inv*, MORNINGSTAR, http://www.morningstar.com/funds/xnas/vfinx/quote.html (last updated Mar. 31, 2017).

[11] Morningstar, *American Funds Growth Fund of Amer A*, MORNINGSTAR, http://www.morningstar.com/funds/xnas/agthx/quote.html (last updated Mar. 31, 2017).

[12] Morningstar, *Vanguard PRIMECAP Inv*, MORNINGSTAR, http://www.morningstar.com/funds/xnas/vpmcx/quote.html (last updated Mar. 31, 2017).

| Fund | Largest Holding | Percent of Total Fund |
|------|-----------------|------------------------|
| VWNFX[13] | Microsoft | 3.22% |
| VTSMX[14] | Apple | 2.89% |

55.    ERISA imposes fiduciary standards for prudence of investments within a Plan. The Fund's concentration of 20% and more in Valeant made it imprudent under ERISA due to this concentration risk. There is general agreement in the securities industry that at least 10-15 non-correlated stocks (or 6% to 10% of portfolio in each stock) are necessary for diversification. *See* EDWARD ELTON & MARTIN GRUBER, MODERN PORTFOLIO THEORY AND INVESTMENT ANALYSIS (3d Ed. 1987); *see also*, Solnik, Bruno. H., *Why Not Diversify Internationally Rather Than Domestically?*, 30 FINANCIAL ANALYSTS JOURNAL 48, 48-54 (1974).

56.    SEC guidelines illustrate the extremity of the Fund's concentration in Valeant. Under SEC guidelines, investment in a single *industry* in excess of 25 percent must be specified in a fund's prospectus unless it is the result of appreciation. Guide 18 to Form N-3 (rev. 2015). The SEC recognizes the outsized risk presented by concentration even in sectors like healthcare or pharmaceuticals, which contains hundreds of companies with a collective market capitalization in the trillions. Here, the Fund invested over 25 percent of its portfolio in a *single stock*.

57.    On information and belief, the Fund nevertheless purchased an additional 1.5 million shares of Valeant in or around late October 2015.[15]

---

[13] Morningstar, *Vanguard Windsor II Inv*, MORNINGSTAR, http://www.morningstar.com/funds/xnas/vwnfx/quote.html (last updated Mar. 31, 2017).

[14] Morningstar, *Vanguard Total Stock Mkt Idx Inv*, MORNINGSTAR, http://www.morningstar.com/funds/xnas/vtsmx/quote.html (last updated Mar. 31, 2017).

[15] *See* Daniel Huang, *As Valeant Goes, So Goes Sequoia*, WALL ST. J. BLOG (Mar. 25, 2016, 4:34 PM), http://blogs.wsj.com/moneybeat/2016/03/25/as-valeant-goes-so-goes-sequoia/.

**B.      Valeant was a Particularly Risky Stock, with Numerous
         Warning Signs that Should Have Caused Defendant to Remove the Fund**

58.      The Sequoia Fund's concentration in Valeant was especially risky due to the nature
of Valeant's business model. Valeant is a Canadian healthcare company that develops,
manufactures and markets branded, generic and branded-generic pharmaceuticals, over-the-
counter products and other medical products.

59.      A "critical element" of Valeant's strategy was "business development" through
acquisitions. *See* Valeant's 2014 Annual Report dated February 25, 2015 at 1, available at:
http://ir.valeant.com/~/media/Files/V/Valeant-IR/reports-and-presentations/893698-final-ar-015-
v001-x21nf3.pdf.

60.      Valeant developed a reputation as a "serial acquirer," whereby it would acquire
products and companies and then drastically slash research and development costs to boost profits.
Valeant's numerous acquisitions resulted in repeated restructuring and integration costs and
constant changes to Valeant's balance sheets and its earnings reports. *See*, *e.g.*, Rapoport, M. and
Hoffman, L, (December 15, 2015), "Valeant: An Accounting Pioneer, Too," The Wall Street
Journal,     available     at:     http://www.wsj.com/articles/valeant-an-accounting-pioneer-too-
1450202504. Thus, Valeant was overly focused on short-term profits derived from increasing the
prices of its drugs but essentially ignored developing newer drugs of its own.

61.      In February of 2008, Valeant named McKinsey & Co. alumnus and pharmaceutical
acquisitions expert Michael Pearson as its Chief Executive Officer.[16] That year, it bought Coria
Laboratories for $95 million and DermaTech (an Australian company) for $12.6 million.

---

[16]  Press Release, *Valeant Pharmaceuticals Announces New CEO and Chairman* (Feb. 4,
2008),   https://www.sec.gov/Archives/edgar/data/930184/000095013708001675/
a37735exv99w1.htm.

16

62.    Acquisitions continued at a breakneck pace over the following years, including the following major transactions:

    a.    In 2009, Valeant bought Dow Pharmaceutical Sciences Inc. for $285 million.

    b.    In 2010, Valeant bought Aton Pharmaceuticals for $318 million. Valeant was also acquired in a reverse merger by Biovail; the combined company had an annual revenue of $1.76 billion.

    c.    In 2011, Valeant bought PharmaSwiss for $481 million and AB Sanitas of Lithuania for about $500 million.

    d.    In 2012, Valeant bought Medicis Pharmaceutical Corp. for $2.6 billion.

    e.    In 2013, Valeant bought Bausch & Lomb for $8.6 billion.

    f.    In 2015, Valeant bought Salix Pharmaceuticals for $11 billion.[17]

63.    Although Valeant temporarily withstood the maelstrom surrounding its brash practices and shaky business model, red flags regarding its performance were evident. In August 2015, Valeant stock reached a closing high of $262, and shares were trading at a remarkable 98 times 2014 GAAP earnings. At the time, about 32% of the Fund's net assets and about 35% of its stock holdings were invested in Valeant. Such an extraordinarily concentrated position in any single issuer would be risky; but with regard to Valeant, a brazen company with murky financials that was continually immersed in controversy, the position was reckless, particularly in view of the Fund's stated investment policies.

---

[17]    Reuters, *Timeline - Shakeup at Valeant as Longtime CEO Pearson Leaving* (March 21, 2016), http://www.reuters.com/article/valeant-timeline-idUSL2N16T1SQ; Valeant, *Key Facts & History*, VALENT PHARMACEUTICALS INTERNATIONAL, INC., http://www.valeant.com/about/key-facts (last visited May 13, 2016).

64.     Valeant's accounting methods cast further doubt on its true value.  Valeant used "cash earnings per share" as its earnings measure. This method shows far greater income than would be evident under standard GAAP rules that investors typically use to compare companies. Under GAAP, the company posted $70 million in net income for the first nine months of 2015. Under its own cash earnings measure, however, the company posted a *profit* of $2.7 billion. *Id.*

65.     The Fund's major investment in Valeant, with its unconventional business model and non-traditional financial statements and metrics, was diametrically opposed to the Fund's Value Policy.

66.     And, with Valeant shares trading at close to 100 times the previous year's GAAP earnings, the Sell Strategy and prudent investment judgment required the Fund to sell, or at least trim, its Valeant position.

67.     Defendant knew or should have known of these problems with Valeant and the Fund no later than September 2015.

## C.     Prudent Fiduciaries Do Not Invest Retirement Assets in Mutual Funds with High Concentrations in Valeant (or any other) Stock

68.     The Fund was a large-cap domestic equity Fund. Of the ten most common large-cap domestic equity funds included in 401(k) plans by similar fiduciaries, only one included any investment in Valeant in 2014 or 2015. As shown in the table below, its holding was a tiny fraction of the Fund's concentration in Valeant, representing 0.1% of that fund's assets, as opposed to nearly 20% of the Fund's assets.

| Fund | Fee | 2015 % Valeant[18] | 2014 % Valeant | 2014 Return | 2015 Return | 2016 Return to June 30, 2016 |
|------|-----|---------|---------|--------|--------|---------------|
| VINIX | 4 bps | 0.0% | 0.0% | 13.65% | 1.37% | 3.55% |
| FCNTX | 70 bps | 0.0% | 0.0%[19] | 9.56% | 6.46% | 0.32% |

---

[18]   As of Dec. 31, 2015 unless otherwise noted.

[19]   As of Sept. 30, 2014.

| Fund | Fee | 2015 % Valeant[18] | 2014 % Valeant | 2014 Return | 2015 Return | 2016 Return to June 30, 2016 |
|------|-----|--------------------|----------------|-------------|-------------|------------------------------|
| FUSEX | 10 bps | $0.0\%^{20}$ | $0.0\%^{21}$ | 13.59% | 1.31% | 3.53% |
| FDGRX | 88 bps | $0.1\%^{22}$ | $0.3\%^{23}$ | 14.44% | 7.83% | -2.68% |
| DODGX | 52 bps | 0.0% | 0.0% | 10.40% | -4.49% | 3.42% |
| VFINX | 16 bps | 0.0% | 0.0% | 13.51% | 1.25% | 3.51% |
| AGTHX | 65 bps | $0.0\%^{24}$ | $0.0\%^{25}$ | 9.30% | 5.36% | 1.16% |
| VPMCX | 40 bps | $0.0\%^{26}$ | $0.0\%^{27}$ | 18.72% | 2.58% | 0.66% |
| VWNFX | 34 bps | $0.0\%^{28}$ | $0.0\%^{29}$ | 11.16% | -3.22% | 4.00% |
| VTSMX | 16 bps | 0.0% | 0.0% | 12.43% | 0.29% | 3.35% |

69.     By comparison, the Fund was more expensive and dramatically more concentrated in Valeant, and it underperformed all ten of the most common alternative funds in each of these three periods.

| Fund | Fee | 2015 % Valeant[30] | 2014 % Valeant | 2014 Return | 2015 Return | 2016 Return to June 30, 2016 |
|------|-----|--------------------|----------------|-------------|-------------|------------------------------|
| SEQUX | 100 bps | 19.3% | 20.0% | 7.55% | -7.29% | -11.60% |

70.     Meanwhile, other investors who had invested in the Fund pulled their money out as the Valeant concentration increased. Investors withdrew more than $500 million from the Fund in 2014 alone, and an additional $213 million during the first 10 months of 2015.[31] Defendant should have monitored these outflows to determine whether the Plan should take similar action.

---

[20] As of Aug. 31, 2015.
[21] As of Aug. 31, 2014.
[22] As of Nov. 30, 2015.
[23] As of Nov. 30, 2014.
[24] As of Aug. 31, 2015.
[25] As of Aug. 31, 2014.
[26] As of Sept. 30, 2015.
[27] As of Sept. 30, 2014.
[28] As of Oct. 31, 2015.
[29] As of Oct. 31, 2014.
[30] As of Dec. 31, 2015 unless otherwise noted.
[31] http://www.bloomberg.com/news/articles/2015-11-10/valeant-holder-sequoia-fund-sees-98-9-million-in-outflows.

## D.   The Close Relationship Between NICO And the Fund's Managers

71.    During the Class Period, the Fund was run by Ruane Cunniff and its portfolio managers Robert D. Goldfarb and David M. Poppe.

72.    Ruane Cunniff is an investment management firm founded by Bill Ruane ("Ruane"), who was a close friend of Buffett, and is NICO's parent company. The two men met originally at Columbia University Business School, where they both studied under Benjamin Graham, the famed "value investor." Together, they shared the same "value investing" philosophy.

73.    In 1969, when Buffett closed his investment company to run Berkshire Hathaway, he recommended that his investors go to Ruane at Ruane Cunniff for money management. Buffett has long publicly touted his respect for Ruane's expertise and skill at prudently managing money. Even recently, in a shareholder letter to Berkshire Hathaway investors, Buffett described Ruane as "truly wonderful human being and a man whom I identified 60 years ago as almost certain to deliver superior investment returns over the long haul."

74.    Buffett also had a close personal relationship with Sharon Osberg ("Osberg"), who became an independent director of the Fund at his recommendation. According to news reports, Osberg had grave concerns over the Sequoia Fund's investment in Valeant, and she discussed her concerns with Buffett. He reportedly advised her on her decision to resign as director from the Fund over her concerns.

75.    It is hardly surprising that the Fund was the most favored investment option for the NICO Plan. In fact, NICO steered Plan funds into the Fund.   NICO selected the Fund as the investment option for all unallocated accounts and participant forfeitures. Plan participants had

20

no control over how Plan funds were invested at these two stages of the process. NICO self-servingly directed Plan funds to the only option offered under the Plan that benefitted itself.

76.    NICO also limited the Plan's investment options so that were no meaningful competitive alternatives to the Fund. NICO knew that the Fund was one of the largest shareholders of Berkshire Hathaway and NICO sought for its employees to invest in the Fund, so that the Fund would continue to invest in Berkshire Hathaway stock.

### E.    The Plan's Large Investment In the Fund

77.    Employee benefit plans typically complete Form 5500 to satisfy their annual reporting requirements under Title I and Title IV of ERISA and under the Internal Revenue Code.

78.    The Plan's Form 5500 reflects that it had $236 million in assets as of December 31, 2014, at year-end, which was invested in sixteen managed funds, most of which were target date funds. By far, the largest investment by the Plan was the Fund with $106 million invested. The second largest investment was the Wells Fargo Advantage Treasury Money Market Fund with $22 million.

79.    This chart shows the size of the Fund as a percentage of the NICO Plan assets:

| Year | Total Plan Assets ($) | Sequoia Fund ($) | Percentage |
|------|----------------------|------------------|------------|
| 2013 | $215,241,331 | $99,850,964 | 46% |
| 2014 | $236,219,306 | $106,315,829 | 45% |
| 2015 | $244,231,644 | $84,509,058 | 35% |

80.    No other investment came anywhere close to this percentage of Plan assets. The Fund was also the directed investment option for all of the Plan's unallocated accounts as well as all participant forfeitures.

21

**F.      There were Ample Warning Signs Defendant Should Have Seen that the Fund's Concentration in Valeant Made the Fund an Imprudent Investment**

81.     Defendant should have been vigilant in selecting and monitoring the prudence of all Plan investment options. Defendant should have been particularly careful with monitoring the Fund given the Plan assets invested therein and the Fund's lack of diversification. Notwithstanding these facts and duties, Defendant failed to properly monitor and, when it became necessary to protect Plan participants from harm, remove the Fund.

82.     Valeant's controversial business practices and opaque financial statements ultimately led to a substantial fall in its stock price in September 2015 that significantly affected the Fund's performance. However, there were serious questions about Valeant's business model and accounting methods long before that should have alerted Defendant that the Fund's substantial investment in Valeant made the Fund an imprudent investment for Plan participants.

83.     In March 2014, Jim Grant, the editor of an investment journal, criticized Valeant for its notable lack of concern for research and development, calling it a "financialized pharmaceutical company" and stating that "the longer a business is under a Valeant umbrella, the worse it performs."

84.     In May 2014, Bronte Capital's John Hempton announced that his fund was shorting Valeant, calling its accounting "difficult to comprehend."

85.     On May 15, 2014, hedge fund billionaire Jim Chanos voiced his skepticism when he stated that Valeant was playing "aggressive accounting games." Mr. Chanos also criticized Valeant's acquisition strategy, noting the dangers and potential accounting issues associated with relying on purchasing other companies for long-term growth.

22

86.     Morgan Stanley, which served as an adviser to Valeant in its failed $53 billion hostile bid for Allergan, Inc., also voiced its skepticism of Valeant. In June 2014, an email from a Morgan Stanley investment banker was released in which he called Valeant a "house of cards."

87.     In February 2015, Valeant purchased a portfolio of older branded drugs. After Valeant acquired them it dramatically increased their prices. Two of the drugs, Nitropress and Isuprel, were important cardiac medicines used by hospitals during heart surgery. These price increases prompted a harsh reaction from politicians, insurers, hospitals and the general public, leaving the impression that Valeant's business was primarily driven by acquisitions and temporary, but unsustainable, price increases.

88.     On March 26, 2015, Charlie Munger, the Vice Chairman of Berkshire Hathaway, stridently criticized Valeant and its then-CEO, J. Michael Pearson. When asked about Valeant at an investor meeting, Mr. Munger compared Valeant to ITT, a company notorious for having earnings that were derived from its aggressive acquisition strategy but whose true value was hollow because it would cover the losses from one acquisition with the "paper profits" of the next one. Mr. Munger stated: "Valeant is like ITT and Harold Geneen (ITT's former CEO) come back to life, only the guy is worse this time." "The guy" Mr. Munger referred to was CEO Pearson.

89.     The harsh criticisms of the Fund's investment strategy and its substantial investment in Valeant did not come from just a few Wall Street investors. At the Fund's annual investors' day that took place on May 15, 2015, the Fund's investment in Valeant dominated the conversation. The Fund's managers openly stated, in contravention of the Fund's Concentration Policy and Sell Strategy, that they would not sell Valeant.

90.     At the May 15, 2015 investors' day meeting, an investor asked the following of the Fund's investment manager, Bob Goldfarb:

23

Q: My main question was then do you plan on keeping the (Fund's) holdings (of Valeant) at 20% or more of your portfolio, or are you going to reduce that?

A: We are going to hold it. We believe (Valeant) will continue to grow (earnings per share) at a rapid rate and that the stock should do quite well.

*See* Transcript from May 15, 2015 Investors' Day at 16, available at:

http://www.sequoiafund.com/Reports/Transcript15.pdf.

91. Mr. Goldfarb's response to the question about the Fund's continued investment in Valeant demonstrated that the Fund was violating the Fund's Concentration Policy by investing more than 25% of its assets invested in a single security, when the policy prohibited investment of more than 25% in a single *industry*. Mr. Goldfarb's comments also demonstrated the Fund's investment in Valeant was violating the Value Policy in which the Fund purported to focus on a company's "balance sheet and earnings history."

92. The May 15, 2015 investors' meeting also made clear that the Fund's earnings were substantially tied to Valeant's performance. If Valeant's stock price did not continue to increase at its unsustainable rate, or, even worse, declined, it would have a dramatic effect on the Fund. By 2015, as Valeant went, so went the Fund.

93. On December 31, 2014, the Fund reported that Valeant represented 20% of its portfolio. Given the risk that high concentrations in a single investment pose to retirement plan investors, Defendant should have taken steps to remove the Fund from the Plan.

94. On March 31, 2015, the Fund reported that Valeant represented 26% of its portfolio. Given the risk that high concentrations in a single investment pose to retirement plan investors, Defendant should have taken steps to remove the Fund from the Plan.

95. The Fund's Semi-Annual Report issued to investors on June 30, 2015 also should have made it clear to Defendant that the Fund was no longer a prudent investment option for the

24

Plan's participants (if indeed it ever was). In the Semi-Annual Report, it was disclosed that 28.7% of the Fund's holdings were in Valeant and that 30% of its holdings were concentrated in Healthcare stocks. *See* Semi-Annual Report dated June 30, 2015.

96.     Information subsequent to the Fund's semi-annual report dated June 30, 2015 provided further evidence that the Fund's concentrated investment in Valeant made the Fund an imprudent investment option for the Plan's participants. For example, on August 14, 2015, Senator Bernie Sanders (D. Vt.) and Congressman Elijah Cummings (D. Md.) requested information from Valeant on why it had aggressively increased the price of Nitropress and Isuprel.

97.     On September 28, 2015, Democrats on the U.S. House of Representatives Oversight and Government Reform Committee signed a letter to the chairman, Rep. Jason Chaffetz (R. Utah), asking him to subpoena Valeant about is "massive price increases."

98.     In December of 2015, Senator Susan Collins (R. Me.) criticized Valeant at a hearing of the Senate's Special Committee on Aging, which she chairs. Referring to Valeant and another company with overnight price increases for decades-old drugs, Senator Collins stated: "These companies are to ethical pharmaceutical companies as a loan shark is to a bank." *See* http://www.nytimes.com/2015/12/10/business/senators-condemn-big-price-increases-for-drugs.html?_r=0.

99.     The criticisms of Valeant went far beyond public relations concerns resulting from any price increases—they questioned Valeant's *entire* business model. In September 2015, Andrew Left of Citron Research published a report on Valeant citing the company's dramatic price increases. According to Mr. Left, Valeant's model was to "jack up prices and cut spending." Mr. Left also noted that in particular Valeant was dramatically cutting spending on research and development (R&D), negatively impacting its ability to develop new drugs. Mr. Left further noted

25

that other pharmaceutical companies in the industry spent on average 17% on R&D while Valeant was only spending 3%.

100.    On October 5, 2015, a Deutsche Bank analyst concluded that Valeant increased the prices on 54 medications in 2015 by an average of 66%. This percent increase was dramatically higher than the industry average of 5% per year.

101.    On October 15, 2015, Valeant disclosed that it had received two subpoenas concerning its drug pricing strategy.

102.    On October 21, 2015, Citron Research released report titled, "Valeant: Could this be the Pharmaceutical Enron?"   In this report, Citron emphasized Valeant's mysterious relationship with Philidor, a pharmacy that distributes drugs for specialty pharmacy, which Valeant had an option to purchase. In its report, Citron insinuated that Valeant was involved in deceptive accounting practices involving Philidor and asked whether Valeant was "Enron part Deux??"

103.    The increasing concentration in Valeant stock, the public information about Valeant, and the increasing concentration of the Fund's investment in Valeant should have caused Defendant to remove the Fund from the Plan no later than September 2015.

## G.    The Fund's Valeant Investment Caused Enormous Plan Losses

104.    Between October 20 and October 22, 2015, Valeant's stock price fell 30%. On October 30, 2015, in an effort to calm the price of Valeant stock, investor William Ackman held a conference call. Following the call, the price of Valeant's shares fell another 16%.

105.    Even dissent *within* the Fund did not cause Defendant to remove the Fund from the list of available investment funds. On October 25, 2015, two of the Fund's four independent directors, Vinod Ahooja and Sharon Osberg, abruptly resigned to publically voice their dissent

over the Fund's strategy. Their resignations followed the Fund Managers' announcement at a board meeting that the Fund had purchased *an additional* 1.5 million shares of Valeant.

106.     After the resignations, Fund Manager Poppe publicly stated that there had been an ongoing debate for a considerable period of time over the Fund's outsized concentration in Valeant. Osberg had been expressing her worries about Valeant at board meetings for over a year, and she grew so concerned that she insisted the discussions be reflected in the minutes. Former Valeant supporter Buffett advised Osberg on her predicament and agreed with her decision to resign after concluding she had done all she could as a board member to steer the company away from its Valeant position.

107.     Undeterred by the wave of internal and external criticism, the Fund sent a letter to its shareholders on October 28, 2015 to try to rationalize its reckless investment in Valeant. The letter stated:

> We work hard to understand Valeant and its business model. Our belief has always been that (Valeant's CEO) is honest and extremely driven. He does everything legally permissible to maximize Valeant's earnings. One lesson of recent events is that sometimes doing everything legally permissible to maximize earnings does not create shareholder value. All enduring businesses must strive to earn and maintain a good reputation. Because of its large indebtedness and need to tap capital markets to make acquisitions Valeant in particular needs the confidence of the credit market to execute its business model.

*See* Letter to Fund Shareholders from the Fund Managers dated October 28, 2015, available at: http://www.sequoiafund.com/Letter%20to%20Clients%20and%20Shareholders.pdf.

108.     From its peak in August 2015 until November 17, 2015, Valeant stock declined from $263 a share to less than $70 a share, losing more than $65 billion in market value. During the same time, the Fund lost approximately 25% of its value. Between October 1, 2015 and December 31, 2015, the Fund lost 9.1% of its value. During the same period, the Standard and Poor (S&P) 500 Index Fund *gained* 7.04%. During 2015, the Fund lost 7.31% of its value. Nearly

all of this decline, 6.3% of the 7.31%, was due to the Fund's holdings in Valeant. *See* Sequoia Fund's Semi-Annual Report dated December 31, 2015 at 4.

109.    According to a report published on November 19, 2015, the Fund ranked 1,258 out of 1,265 large capitalization stock mutual funds based on one-year performance. This dismal ranking was due to the precipitous decline in Valeant's stock price.

110.    An article recently featured in the Investing section of *U.S. News*, which accurately reflects the recent Valeant and Fund debacle as a "brutal lesson" and a "cautionary tale," reiterates a well-settled and widely-known investment cornerstone: "There is a saying in the investment world that goes, if you want to make the most money, invest in one stock, and if you want to lose everything, invest in one stock. Either way, when you have heavy concentrations in one stock you are not investing, you are speculating." An investment advisor adds, "I am OK with my clients speculating, but only with a small portion of their savings that they are OK with losing." *See* http://money.usnews.com/investing/articles/2016-04-20/valeant-pharmaceuticals-the-brutal-lesson-of-vrx-stock.

111.    The chart below, published in a Bloomberg article in April of 2016, shows the drastic effect that the Valeant holdings had on the Fund's performance over a one-year period, which closely tracks the Class Period. The Fund would have realized an 8% gain without Valeant; instead, it suffered a 22% loss because of Valeant.

28

**The Valeant Penalty**

Sequoia Fund performance with and without Valeant Pharmaceuticals



http://www.bloomberg.com/news/articles/2016-04-20/how-sequoia-fund-s-valeant-mistake-upended-a-top-return-chart.

112.    The United States Senate Special Committee on Aging has been conducting investigations into dramatic increases in drug prices imposed by Valeant as well as other pharmaceutical companies. Recently departed former Valeant CEO Pearson testified that "Valeant was too aggressive in raising drug prices." Pearson specifically mentioned "two cardiac-care drugs that [Valeant] acquired in 2015 and quickly boosted prices on by 525% and 212%...." *See* http://www.wsj.com/articles/valeant-was-too-aggressive-in-raising-drug-prices-ceo-says-1461729662.

113.    Buffett and Charles Munger had not liked Valeant for quite some time. In an April 30, 2016 Reuters article, Munger made this abundantly clear: "Valeant was a sewer, and those who created it deserved the opprobrium they got." In the same article, Buffett described Valeant's business model as "enormously flawed." *See* http://www.reuters.com/article/berkshire-buffett-valeant-idUSL2N17X0I4.

114. The Plan, Plaintiff and similarly-situated participants have suffered the consequences of these catastrophic losses.

## H.    Defendant NICO's Failure to Protect the Plan from Imprudent Sequoia

115. By the start of the Class Period, the Fund had become an imprudent investment due to its high concentration in the speculative Valeant stock. At this time, NICO had sufficient cause and reason to reassess and reevaluate the Fund as an investment option within the Plan due to its material changes and deviation from a value strategy. NICO knew (or should have known) that there were limited value-oriented alternatives within the Plan, that a huge percentage of the Plan held the Fund, and that written elections were made so that a large percentage of new contributions made into the plan would be invested in the Fund.

116. First, as described by the DOL's guidance, NICO was required to have a process for reviewing and revaluating the Plan's investment option on a regular basis. Before commencing this action, Plaintiff, through his counsel, served a plan request under ERISA which sought NICO's records showing its review and assessment of the Fund. NICO refused to produce any responsive documents. Accordingly, one can only conclude that NICO did not have any meaningful procedures or processes in place to conduct the necessary review and evaluation of the Fund that a prudent fiduciary would have had in place. This lack of procedures and processes is damning evidence of Defendant's utter failure to adhere to its fiduciary duty to ensure the prudence of Plan participants' investments, including the Fund.

117. Second, NICO failed to eliminate the Fund as an investment option, and it continued to steer Plan funds into the Fund by making the Fund the default investment option for both unallocated accounts and participant forfeitures. Upon review, NICO should have ceased or stopped all new purchases into the Fund by the Plan. Throughout the Class Period, NICO knew

or should have known that the Fund was deeply concentrated up to 20% in Valeant stock. Valeant's business model was based on rapid billion-dollar acquisitions; it was cutting (and not investing) in product R&D; and its accounting measures were highly suspect. The Fund was no longer value-oriented but concentrated in a highly speculative stock which was the largest single risk exposure to the Plan.

118.    Third, NICO should have transferred Plan funds out of the Fund and into an alternative, prudent value fund. Upon review, NICO should have selected an alternative, prudent value fund for the Plan, and transferred all of the Plan's holdings from the Fund. For the same reasons discussed *supra*, NICO knew (or should have known) that the risk of the Fund was not appropriate for the Plan, which was intended to preserve the retirement savings of NICO's employees. Valeant had already been described as a "house of cards," and it was not appropriate for the Plan to continue holding the Fund while it was so deeply concentrated in as speculative an investment as Valeant.

119.    In fact, as discussed *supra*, in March 2015, Berkshire Hathaway's Charlie Munger had compared Valeant to ITT, which was notorious for its aggressive acquisition strategy and using accounting tricks to cover its losses. NICO knew or should have known that Charlie Munger, the Vice Chairman of its parent company, had harshly criticized Valeant and its CEO for its growth by acquisitions and its accounting. NICO also knew or should have known of the other accusations over Valeant's accounting practices that were made following its failure to acquire Allergan.

120.    Worse, NICO still failed to act during the Class Period, even as Valeant's material risks, suspect nature and artificially inflated price became more and more obvious to the professional investor community. The Fund's large stake in Valeant was poised for collapse, yet NICO took no action to prevent foreseeable harm to the Plan participants, including purchasers

31

and existing holders. NICO's inaction caused more harm than good to the Plan and its participants,

both purchasers and existing holders—and, in light of the overwhelming evidence discussed *supra*,

no reasonable fiduciary could have concluded otherwise.

121.    In short, NICO breached its duties to the Plan by failing to eliminate or sell out the

Sequoia Fund as an investment option in the Plan due its imprudence. It is reasonable to infer that

NICO's failure to objectively and impartially evaluate the Fund and to detect its gross deviation

from its stated investment style and strategy was caused, in part or in whole, by the close ties

between and among Buffett, Ruane Cunniff and the Fund, and by NICO's concerns over upsetting

one of Berkshire Hathaway's largest shareholders.

## VIII.  CLASS ACTION ALLEGATIONS

122.    To the extent appropriate, Plaintiff brings this action as a class action pursuant to

Rules 23(a), (b)(1), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure on behalf of

Plaintiff and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan at any time from
> January 1, 2015 up to and including the date of judgment in this action (the "Class
> Period") and whose Plan accounts included investments in the Fund (the "Class").

123.    The members of the Class, which is estimated to number in the thousands, are so

numerous that joinder of all members is impracticable. Indeed, based on public filings by the Plan,

there are approximately two thousand potential class members.

124.    Common questions of law and fact exist as to all members of the Class and

predominate over any questions affecting solely individual members of the Class, including:

> a.    whether Defendant owed fiduciary duties to the Plan, Plaintiff and
>
> members of the Class;

32

      b.      whether Defendant breached its fiduciary duties to the Plan, Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries;

      c.      whether Defendant violated ERISA; and

      d.      whether the Plan and members of the Class have sustained damages and, if so, what is the proper measure of damages.

125. Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff, the Plan and the other members of the Class each sustained damages arising out of Defendant's wrongful conduct in violation of federal law as complained of herein.

126. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained competent counsel experienced in class actions and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Plan or the Class.

127. Class action status is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

128. Class action status is also warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant.

129.    Class action status is warranted under Rule 23(b)(2) because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

130.    Class action status is warranted under Rule 23(b)(3) because a class action would be superior to individual actions and common questions of law and fact predominate over individual questions.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### (Breach of Duty of Prudence)

131.    Plaintiff incorporates by reference the paragraphs above.

132.    During the Class Period, Defendant was an ERISA fiduciary.

133.    Defendant was obliged to prudently manage all of the Plan's assets pursuant to its fiduciary duties.

134.    As alleged above, the scope of the fiduciary duties and responsibilities of Defendant included managing the assets of the Plan with the care, skill, diligence, and prudence required by ERISA. Defendant was directly responsible for, among other things, selecting and offering only prudent investment options, eliminating imprudent options, determining how to invest employer contributions to the Plan and directing the Trustee regarding the same, evaluating the merits of the Plan's investments on an ongoing basis, administering the operations of the Trust and taking all necessary steps to ensure that the Plan's assets were invested prudently.

135.    According to DOL regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment

duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, and (b) he has acted accordingly.

136.   Defendant had a duty to follow a regular, appropriate systematic procedure to evaluate the prudence of maintaining the Fund as an investment option under the Plan. It failed to conduct an appropriate investigation of the merits of continued investment in the Fund. Given the limited availability of investment options offered to Plan participants along with the Fund's change in investment style and strategy that allowed it to become so heavily concentrated in a single security, such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to offer the Fund as an investment option or make and maintain investment in the Fund under these circumstances. More specifically:

> a.    A reasonably prudent fiduciary needs to monitor all investment options, but particularly an investment option that, like here, is one of the most popular investments in the plan.
>
> b.    A reasonably prudent fiduciary would have carefully monitored the Sequoia Fund to ensure that it remained a prudent retirement investment option for Plan participants. *See Tibble v. Edison*, 135 S. Ct. 1823, 1829 (2015).
>
> c.    A reasonably prudent fiduciary would have carefully monitored the Sequoia Fund to ensure that it adhered to its purported investment strategy as described to investors in general and to Plan participants in particular.
>
> d.    A reasonably prudent fiduciary would have considered carefully whether to diversify the Plan's menu of actively managed domestic value funds available to Plan participants.

35

e.     A reasonably prudent fiduciary would have removed the Sequoia Fund from the Plan menu if the Sequoia Fund was no longer a prudent retirement investment option for Plan participants or if it deviated from its purported investment strategy. *See Tibble*, 135 S. Ct. at 1829.

f.     A reasonably prudent fiduciary would have made affirmative warnings to plan participants regarding the Sequoia Fund.

137.   Nonetheless, during the Class Period, these Defendants continued to permit the Plan to offer the Fund as an investment option and continued to permit the Plan to invest in the Fund.

138.   In addition, upon information and belief, it appears that NICO lacked *any* procedures and processes for conducting regular monitoring and evaluation of the prudence of the Plan's investments, including the Fund.  This complete lack of procedures and processes constitutes a dereliction of NICO's fiduciary duty of prudence separate and apart from the disastrous harm caused by the Plan's continued investment in the Fund.

139.   The foregoing breaches of duty entitle Plaintiff to relief under ERISA.

## SECOND CAUSE OF ACTION
### (Breach of Duty of Loyalty)

140.   Plaintiff incorporates by reference the paragraphs above.

141.   During the Class Period, Defendant was an ERISA fiduciary.

142.   Defendant was obliged to loyally manage all of the Plan's assets pursuant to these duties.

143.   As alleged above, Defendant was directly responsible for, among other things, managing the assets of the Plan for the sole and exclusive benefit of participants as required by ERISA.

36

144.     The duty of loyalty requires a fiduciary to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

145.     NICO had a duty to avoid conflicts of interests, yet instead it used Plan assets to foster them.  The Fund had a close relationship with Berkshire Hathaway's senior officers and it was one of the largest stockholders of Berkshire Hathaway—NICO's parent company.  Moreover, NICO intentionally steered Plan funds to the Fund by directing that all of the Plan's unallocated accounts, as well as all participant forfeitures, be invested "[o]ne hundred percent in" the Fund.  In an uncomfortably conflicted relationship, NICO strongly favored the Fund because it, in turn, invested heavily in Berkshire Hathaway stock, and NICO therefore sought to keep the Plan heavily invested in the Fund over competitive alternatives that were not made available to Plan participants.

146.     The foregoing breaches of duty entitle Plaintiff to relief under ERISA.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for:

1.     A Declaration that Defendant NICO has breached its ERISA fiduciary duties to the Plaintiff and other similarly situated Plan participants;

2.     An Order compelling Defendant to make good to the Plan all losses to the Plan resulting from Defendant's breaches of their fiduciary duties, including loss of vested benefits to the Plan resulting from imprudent investment of the Plan's assets; to restore to the Plan all profits Defendant made through use of the Plan's assets; and to restore to the Plan all profits which the Plan and participants would have made if Defendant had fulfilled its fiduciary obligations;

3. Imposition of a constructive trust on any amounts by which Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

4. An Order enjoining Defendant from any further violations of their ERISA fiduciary obligation;

5. An Order requiring Defendant to appoint one or more independent fiduciaries to participate in the management of the Plan's investments;

6. Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

7. An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

8. An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

9. An Order for equitable restitution and other appropriate equitable and injunctive relief against Defendant.

## DEMAND FOR JURY TRIAL

Plaintiff and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

DATED: May 25, 2017

By: /s/ Brian K. Matise
    Brian K. Matise

**BURG SIMPSON ELDREDGE HERSH & JARDINE, P.C.**
40 Inverness Drive East
Englewood, CO 80112
Telephone:  (303) 792-5595
Facsimile:  (303) 708-0527
*BMatise@burgsimpson.com*

*Counsel for Plaintiff and the Putative Class*

**ZAMANSKY LLC**

Samuel E. Bonderoff*
Jacob H. Zamansky*
Edward H. Glenn, Jr.*
Justin Sauerwald*

50 Broadway, 32nd Floor
New York, NY 10004
Telephone:  (212) 742-1414
Facsimile:  (212) 742-1177
*jake@zamansky.com*

* *pro hac vice* application forthcoming

*Counsel for Plaintiff and the Putative Class*

JS 44 (Rev. 08/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Marc J. Muri

**DEFENDANTS**
National Indemnity Company

**(b)** County of Residence of First Listed Plaintiff    Richland County, SC
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Douglas County, NE
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Brian K. Matise
Burg Simpson Eldredge Hersh & Jardine, P.C.
40 Inverness Drive East, Englewood, CO 80112 / 303-792-5595

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
       Plaintiff

☒ 3  Federal Question
       *(U.S. Government Not a Party)*

☐ 2  U.S. Government
       Defendant

☐ 4  Diversity
       *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                    *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**  **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane  ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product         Product Liability |  |  | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument |      Liability  ☐ 367 Health Care/ |  | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &         Pharmaceutical |  | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
|      & Enforcement of Judgment |      Slander         Personal Injury |  | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'         Product Liability |  | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted |      Liability  ☐ 368 Asbestos Personal |  |  | ☐ 470 Racketeer Influenced and |
|      Student Loans | ☐ 340 Marine         Injury Product |  | **SOCIAL SECURITY** |      Corrupt Organizations |
|      (Excludes Veterans) | ☐ 345 Marine Product         Liability | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment |      Liability  **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
|      of Veteran's Benefits | ☐ 350 Motor Vehicle  ☐ 370 Other Fraud |      Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle  ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 864 SSID Title XVI |      Exchange |
| ☐ 190 Other Contract |      Product Liability  ☐ 380 Other Personal |      Relations | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal         Property Damage | ☐ 740 Railway Labor Act |  | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise |      Injury  ☐ 385 Property Damage | ☐ 751 Family and Medical |  | ☐ 893 Environmental Matters |
|  | ☐ 362 Personal Injury -         Product Liability |      Leave Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
|  |      Medical Malpractice | ☐ 790 Other Labor Litigation |  |      Act |
| **REAL PROPERTY** | **CIVIL RIGHTS**  **PRISONER PETITIONS** | ☒ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights  **Habeas Corpus:** |      Income Security Act |      or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 220 Foreclosure | ☐ 441 Voting  ☐ 463 Alien Detainee |  | ☐ 871 IRS—Third Party |      Act/Review or Appeal of |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment  ☐ 510 Motions to Vacate |  |      26 USC 7609 |      Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/         Sentence |  |  | ☐ 950 Constitutionality of |
| ☐ 245 Tort Product Liability |      Accommodations  ☐ 530 General |  |  |      State Statutes |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -  ☐ 535 Death Penalty | **IMMIGRATION** |  |  |
|  |      Employment  **Other:** | ☐ 462 Naturalization Application |  |  |
|  | ☐ 446 Amer. w/Disabilities -  ☐ 540 Mandamus & Other | ☐ 465 Other Immigration |  |  |
|  |      Other  ☐ 550 Civil Rights |      Actions |  |  |
|  | ☐ 448 Education  ☐ 555 Prison Condition |  |  |  |
|  | ☐ 560 Civil Detainee - |  |  |  |
|  |      Conditions of |  |  |  |
|  |      Confinement |  |  |  |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
     Proceeding

☐ 2 Removed from
     State Court

☐ 3 Remanded from
     Appellate Court

☐ 4 Reinstated or
     Reopened

☐ 5 Transferred from
     Another District
     *(specify)*

☐ 6 Multidistrict
     Litigation -
     Transfer

☐ 8 Multidistrict
     Litigation -
     Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
29 U.S.C. 1001 et seq.
Brief description of cause:
Breach of fiduciary duty under ERISA

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION
   UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE  5/25/17

SIGNATURE OF ATTORNEY OF RECORD *(signature)*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____



Page 1 of 1

ORIGIN ID APAA          (303) 792-5505
HEATHER CHRISTMAN
BERG SERVICES
40 INVERNESS DR E

ENGLEWOOD, CO 80112
UNITED STATES US

SHIP DATE: 25MAY17
ACTWGT: 1.00 LB
CAD: 33886/ONET3856

BILL SENDER

TO  CLERK - ROOM 1152
    USDC - NEBRASKA
    111 SOUTH 18TH PLAZA, SUITE 1152

    OMAHA NE 68102
    (303) 792-5505

REF: MUSUWCO  7002410
DEPT:
PO



FRI - 26 MAY 10:30A
PRIORITY OVERNIGHT

TRK#
7792 3494 7076

68102
NE-US   OMA

XX AIAA



Extremely Urgent