IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| MARC J. MURI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NATIONAL INDEMNITY COMPANY,<br><br>Defendants. | 8:17-CV-178<br><br>MEMORANDUM AND ORDER |

The plaintiff, Marc Muri, is suing his former employer, National Indemnity Company, for allegedly breaching the fiduciary duties owed to him, and all others similarly situated, under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq*. National Indemnity has moved for summary judgment on Muri's claims. For the reasons discussed below, the Court will grant National Indemnity's motion and Muri's claims will be dismissed.

BACKGROUND

The Court's prior Memorandum and Order (filing 38) set forth the background of this case in detail. Muri was employed by National Indemnity, an insurance provider located in Omaha, Nebraska. Filing 1 at 7. During his employment, Muri participated in National Indemnity Company's Employee Retirement Savings Plan ("the Plan"). Filing 1 at 2. The Plan—which is a defined contribution plan—in essence, allows participating employees to contribute a portion of their salary, which National Indemnity then matches, towards individual retirement accounts. Filing 100 at 13. Participants do so by

choosing from a variety of fund options, all of which offer different investment styles and risk profiles, in which to invest their contributions. Muri elected to invest in the Sequoia Fund. Filing 100 at 13.

Generally speaking, the Sequoia Fund is a non-diversified, long-term growth, mutual fund managed by Ruane, Cunniff & Goldfarb, Inc. Filing 100 at 37. The Sequoia Fund invests in "common stocks it believes are undervalued at the time of purchase and have the potential for growth." Filing 1 at 13. And it sells common stocks "when the company shows deteriorating fundamentals . . . or its value appears excessive relative to its expected future earnings." Filing 1 at 11.

But Muri alleges that the Sequoia Fund was, as of January 2015, no longer a prudent investment option. Filing 1 at 4. And Muri contends the Sequoia Fund violated its own "value policy" by over-concentrating its investments in one, high risk stock: Valeant Pharmaceuticals. Filing 1 at 3; *see also* filing 1 at 2. In essence, Valeant's business model is to acquire various competitors, and products, then drastically cut research and development costs in an effort to boost profits. Filing 1 at 16.

According to Muri, Valeant's acquisition strategy, along with its accounting practices, began raising "red flags" around the industry. *See* filing 1 at 16-17. Specifically, investors began questioning Valeant's "cash earnings per share" accounting method, which appeared to vastly overstate Valeant's net income. Filing 1 at 18. And suspicions also arose surrounding Valeant's stock price which, at its peak, had a trade value almost ninety-eight times higher than its previous year's earnings. Filing 1 at 17. As a result, Valeant became the subject of intense scrutiny by investors, analysts, and elected officials. *See* filing 1 at 22-26. Despite that skepticism, however, Sequoia Fund

2

managers allegedly refused to diminish the Fund's concentration in Valeant stock, and instead, acquired more. *See* filing 1 at 24.

In October 2015, Valeant's stock price fell dramatically, and by November 2015, Valeant had lost more than $65 billion in market value. Filing 1 at 27. This, in turn, caused the Sequoia Fund to lose approximately twenty five percent of its value—vastly diminishing the retirement account of Muri, and other Plan participants, who invested in the Fund. *See* filing 1 at 27.

It is with that backdrop that this litigation ensued. Muri claims that from January 1, 2015, through the date of judgment in this action (the "Class Period"), National Indemnity violated the fiduciary duties it owed to Muri and other Plan participants by: (1) failing to prudently manage the Plan by offering "shortsighted" investment options, such as the Sequoia Fund; and (2) failing to avoid conflicts of interest in choosing its investment options, specifically those with close relationships to National Indemnity's parent company, Berkshire Hathaway. Filing 1 at 34-37. National Indemnity moves for summary judgment on both Muri's duty of prudence and duty of loyalty claims. *See* filing 79 at 1.

## STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

## DISCUSSION

To prevail on a claim of breach of fiduciary duty under ERISA, the plaintiff "must make a prima facie showing that [a] defendant acted as a fiduciary, breached [his] fiduciary duties, and thereby caused a loss to the Plan." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009). As explained in the Court's prior Memorandum and Order, ERISA imposes upon fiduciaries twin duties of loyalty and prudence. Those duties generally require fiduciaries to act in the sole interest of plan participants and to carry out their duties with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with

4

such matters would use in the conduct of an enterprise of a like character and with like aims. *Id.* at 595.

According to National Indemnity, however, the record evidence does not contain any, much less sufficient, evidence from which a reasonable fact finder could find that National Indemnity acted imprudently or disloyally in its administration of the Plan. As such, National Indemnity urges dismissal of Muri's duty of prudence and duty of loyalty claims.

### I. DUTY OF PRUDENCE

As briefly noted above, the duty of prudence requires fiduciaries to act solely in the interest of plan participants and beneficiaries and ERISA requires fiduciaries to carry out their duties with care, skill, prudence, and diligence under the circumstances. *Id.* But that duty requires fiduciaries to act with prudence, not prescience, and thus, the relevant inquiry focuses on the information available to the fiduciary at the time of the relevant investment decision. *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt., Inc.*, 712 F.3d 705, 716. (2d Cir. 2013).

Relatedly, a plan fiduciary also has a continuing duty to monitor and evaluate the fund options in the Plan and to remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). That means the fiduciaries must "systematically consider all the investments of the [Plan] at regular intervals to ensure that they are appropriate." *Id.* But even if a fiduciary did not adequately engage in a review process before making a decision, that fiduciary is insulated from liability if a hypothetical prudent fiduciary would have made the same decision anyway. *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917–18 (8th Cir. 1994) (citation omitted).

Generally speaking, Muri contends that because "[n]o reasonable fiduciary would have made the poor choices that [National Indemnity] made

5

and cost the Plan and its participants tens of millions of dollars in lost retirement savings[,]" National Indemnity has breached its duty of prudence. Filing 100 at 13. More specifically, Muri points out that Charles Wert—an institutional trustee for many major corporations including Boeing, AT&T, Ford Motor Company, and Parsons—opined that the Committee had "failed to follow an appropriate process under the circumstances for monitoring and removing the Sequoia Fund" and "failed to implement an investment policy and thus had no legitimate process to evaluate investments." Filing 77-1 at 1, 14; filing 100 at 51. And as a result, Muri claims, "a reasonable plan fiduciary, following a well-designed monitoring process, would have placed the Sequoia Fund on a watch list by the third quarter of 2014." Filing 77-1 at 14.

But even viewing those facts in the light most favorable to Muri, no reasonable fact finder could determine that National Indemnity failed to meet its duty of prudence. Indeed, nothing in Wert's opinion suggests that National Indemnity's Plan committee was not thinking about, or consistently reviewing, the prudence of the Sequoia Fund. *See* generally filing 77-1 at 1-40. Nor has Muri pointed the Court to any authority suggesting that the failure to have an investment policy in place , standing alone, proves imprudence. *See* filing 100 at 51.

Instead, when evaluating whether a fiduciary has acted prudently, the Court must focus on the process by which the fiduciary makes its decisions rather than the results of those decisions. *Braden*, 588 F.3d at 595. Fiduciaries breach the continuing duty to monitor when they fail to investigate whether an investment is imprudent after changed financial circumstances increase the risk of holding stock. *Schaefer v. Ark. Med. Soc'y*, 853 F.2d 1487, 1492 (8th Cir. 1988) (fiduciaries must "investigate all decisions that will affect the pension plan"); *see Vigeant v. Meek,* 352 F. Supp. 3d 890, 898 (D. Minn. 2018); *see also*

6

*Armstrong v. LaSalle Bank Nat'l Ass'n,* 446 F.3d 728, 733 (7th Cir. 2006) (a trustee who simply ignores changed circumstances that have increased the risk of loss to beneficiaries is imprudent).

But here, the record evidence demonstrates that the committee did not ignore the increased risk of maintaining the Sequoia Fund. Instead, as National Indemnity correctly points out, the Committee monitored Sequoia and the Plan's other investments by meeting quarterly, reviewing performance evaluation reports from Wells Fargo, and relying on information in the financial press surrounding Valeant and the Sequoia Fund. Filing 84 at 11. In particular, around August 2014, the time that the Sequoia Fund began performing lower than its initial benchmarks, the Committee regularly discussed the prudence of that fund. Filing 77-8 at 2. And at the August 21 quarterly meeting, the Committee reviewed the Wells Fargo performance evaluation for the Sequoia Fund. As reflected in the committee minutes of that meeting, the committee discussed the Sequoia Fund's recent underperformance and Wells Fargo's downgrade of Sequoia from an "A" rating to a "B" rating was addressed. *See* filing 77-8 at 2. But despite its underperformance, and Wells Fargo's downgrade of the Sequoia Fund's rating, the committee recognized that "Wells Fargo considers it to still be an excellent fund," and noted that the Sequoia Fund's three, five, and ten year performance projections were higher than its benchmarks. Filing 77-8 at 2.

A few months later, in November 2014, the Committee again discussed the Sequoia Fund, which had since been downgraded to a "C" rating by Wells Fargo. Filing 77-9 at 2. The committee, in particular, noted that Sequoia was highly concentrated in Valeant Pharmaceuticals which had been buying small pharmaceutical firms and was in the midst of a "takeover battle." Filing 77-9 at 2. But the Committee noted that the Sequoia Fund held 18.2 percent of its

assets in cash and that Wells Fargo considered Sequoia "to still be an excellent fund." Filing 77-9 at 2. And so, the Committee didn't take any action at that time with respect to the Sequoia Fund—which it noted had been in the fund lineup since the latter 1970s. Filing 77-9 at 3.

Soon after, Sequoia's performance improved. At the February 2015 committee meeting, the committee noted that the Sequoia Fund's rating improved from a "C" rating to a "B" rating. At the next quarterly meeting, the committee notes, again, reflect that the Sequoia Fund's performance was improving—specifically noting that its Wells Fargo rating improved from a "B" to an "A" rating. Filing 84-17 at 3. And during the August 2015 meeting, the Committee noted that the Sequoia Fund's Wells Fargo rating remained at an "A" rating. Filing 84-19 at 2-3; Filing 77-11 at 15.

But around this time, Valeant stock price began to dramatically decline, and as a result, the Sequoia Fund lost significant value. So, on October 28, 2015, Committee members discussed the stability of the Sequoia Fund and its investment in Valeant stock. Filing 27-22 at 1-2. Specifically, the committee reviewed an investor letter from Sequoia concerning its Valeant position, Valeant's negative impact on its performance, and its rationale for continuing to invest in Valeant. Filing 27-22 at 1-2. Based on this information, National Indemnity sent a communication to Plan participants notifying them that Valeant was Sequoia's largest holding, that Valeant was in the news due to a significant price decline, and that two of Sequoia's outside directors had resigned. Filing 84-20 at 2; filing 77-12 at 2-3. The letter did not take a position as to whether plan participants should reconsider investing in the Sequoia Fund, but it did highlight to participants that the Sequoia Fund was not performing to expectations and that "[i]t is up to each plan participant to make

8

her or his investment decisions in the Plan." Filing 84-20 at 3; filing 77-12 at 2-3.

A few weeks later, at the November 24, 2015 Committee Meeting, the committee discussed the Sequoia Fund. Filing 84-20 at 3. Specifically, the committee minutes reflect that the Sequoia Fund began decreasing in value due to the Fund's largest holding, Valeant Pharmaceuticals—which was experiencing a significant decline in its market value. Filing 84-20 at 2-3. The committee also discussed "Valeant's business model, its practices as reported in the news, and the volatility of Valeant's stock that included the drop in value since June 30, 2015." Filing 84-20 at 2-3. And ultimately, the committee decided to place the Sequoia Fund "on the watch list to be discussed at the February 2016 meeting." Filing 84-20 at 4.

In February 2016, the Sequoia Fund was, again, the topic of extensive discussion. The Committee "discussed the many issues facing Valeant in January and February 2016 including its business model, its practices as reported in the news, the continued volatility of Valeant's stock and drop in value, [the Securities Exchange Commission's] investigation into its relationship with a drug distributor and its delay in submitting its annual filing with SEC." Filing 84-21 at 3. More specifically,

> [t]he Committee discussed various options with regard to Sequoia, one of which was whether to remove Sequoia as an investment option in the Plan. There are alternative investment options in the Plan available to participants that do not want to invest in Sequoia or who want to liquidate their investment in Sequoia. However, the Committee did not want to force participants into liquidating

9

which would happen if the Plan removed Sequoia as an investment option.

Filing 84-21 at 3. Instead, the Committee decided "to watch Sequoia and allow plan participants to decide based on their individual investment goals whether to continue their investment in Sequoia or to liquidate." Filing 84-21 at 3.

So, in March 2016, National Indemnity sent a second communication to its employees notifying plan participants that the Sequoia Fund is one of the options in the Plan, and that employees should read about the recent developments concerning Valeant. Filing 84-22 at 2. This announcement also included a link from the Sequoia Fund to its shareholders concerning the retirement of the co-manager of the Sequoia Fund. Filing 84-22 at 2.

And at the following quarterly meeting, the committee discussed Valeant and its negative impact on the Sequoia Fund. In particular, the committee noted that market value of Valeant was decreasing and highlighted a Wall Street Journal article published on March 23, 2016 entitled "Valeant Losses Could Hurt Retirement Plans of More Than 50 Companies." Filing 84-23 at 3. But because the Plan "provides alternative investment options to participants that do not want to invest in Sequoia or who want to liquidate their investment in Sequoia", the Committee decided to continue to watch Sequoia and allow "participants to decide based on their individual investment goals whether to continue their investment in Sequoia or to liquidate." Filing 84-23 at 4.

That decision was based, at least in part, on the Committee's understanding that "Sequoia sold Valeant in the first quarter reducing its holdings significantly." Filing 84-23 at 4. And the Committee also noted that because the "Sequoia [Fund was] taking steps to make sure what has happened will not happen again, the Committee did not want to recommend removing

10

Sequoia as an investment option in the Employee Retirement and Savings Plan." Filing 84-23 at 4. Soon after, the Sequoia Fund completely divested itself of Valeant stock. Filing 84-11 at 7.

In other words, there is extensive undisputed evidence in the record demonstrating that the Committee monitored funds in the Plan, and specifically, evidence that the Committee analyzed and reviewed the prudence of maintaining the Sequoia Fund as a plan option.[1] *Tibble,* 135 S. Ct. at 1828; *see also Vigeant,* 352 F. Supp. 3d at 898 (finding that annually determining the fair market value of the stock at issue with the opinion of an independent appraiser was sufficient in the face of changed financial circumstances). That conduct satisfies National Indemnity's continuing duty to monitor and evaluate the fund options in the Plan, and no reasonable fact finder could conclude otherwise. *See Tibble,* 135 S. Ct. at 1828.

Even so, Muri argues that National Indemnity's monitoring process was still insufficient. But that argument is not based on Muri's contention that

---

[1] Muri appears to argue that the Committee's minutes do not accurately reflect the discussions at the quarterly committee meeting. Filing 100 at 13. For example, Muri points out that the Committee minutes suggest that "Wells Fargo still considers [Sequoia] to be an excellent fund" but what the Wells Fargo representative actually said was that Wells Fargo was "not panicked" about the state of the Fund. *See* filing 100 at 13. Muri also takes issue with the Committee notes reflecting the fact that the Sequoia Fund has been a Plan option since the late 1970s but Karen Rainwater, who drafted the Committee minutes, could not specifically remember that statement being discussed. Filing 100 at 30. But these discrepancies, if any, do not create a genuine dispute of material fact. Indeed, Muri has not provided the Court with any persuasive evidence that the Committee minutes are meaningfully inaccurate—it is, rather, the sort of "metaphysical doubt" that will not suffice to oppose summary judgment. *See Scott v. Harris,* 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)).

11

National Indemnity was not monitoring the Sequoia Fund. *See id.* Instead, that argument hinges on Muri's contention that National Indemnity's reliance on publicly available information—such as Valeant's declining market value, the financial press concerning Valeant and the Sequoia Fund, and signs that the Sequoia Fund may be overly concentrated in a high-risk stock (*i.e.*, Valeant)— did not satisfy its duty to prudently monitor its Plan assets. *See* filing 100 at 51-52. In particular, Muri claims that Plan fiduciaries should have placed Sequoia Fund on the watch list earlier than it actually did, filing 99-5 at 8-25, done "additional research" on the Sequoia Fund's investment in Valeant, filing 100 at 51-52, sought assistance from disinterested experts, filing 77-2 at 17, and engaged in a "quantitative analysis of [the Plan's] investment options" to determine, under the circumstances, whether continuing to offer the Sequoia Fund was imprudent, filing 100 at 51-52; *see also* filing 99-5 at 8-25.

But that notion—that a plan fiduciary must go beyond the review of publicly available information when nothing in the record suggests that a particular investment's market price is unreliable—was recently rejected by the Eighth Circuit in *Usenko v. MEMC LLC et al.,* No. 18-1626, slip op. at 1-9 (8th Cir. June 4, 2019). In *Usenko*, the plaintiff alleged that SunEdison Semiconductor, LLC; the investment committee in charge of the plaintiff's employers' retirement savings plan; and the members of the investment committee; breached their fiduciary duties under ERISA. *Id.* at 2. More specifically, the plaintiff claimed that the defendants "knew or should have known" that one of the stocks offered in the retirement savings plan at issue, SunEdison, was in poor financial condition and thus, should have been removed from the plan's assets. *Id.* at 2. And because by July 2015, it was "widely reported" that SunEdison was facing liquidity problems and was in financial distress following a series of ambitious acquisitions, the plaintiff's

12

complaint "fault[ed] the defendants for failing to act on this publicly available information and allege[d] that the decline[] in SunEdison's stock price and reports of SunEdison's extraordinary debts and liquidity problems should have prompted them to investigate and ultimately determine that divesting from SunEdison stock would be prudent." *Id.* at 7

Missing from the record, however, were any "allegations that the circumstances indicating [] that [the defendants] could not rely on the market's valuation of SunEdison stock." *Id.* To the contrary, the Eighth Circuit noted that the evidence suggested that the financial press' negative commentary and SunEdison's liquidity problems *were* reflected in the decline of SunEdison's stock price. *Id.* And "a security's price in an efficient market reflects all publicly available information and represents the market's best estimate of its value in light of its riskiness and the future net income flows that those holding it are likely to receive." *Id.* at 6. So, where the plaintiff's allegations turn on the assumption that the defendants "breached their fiduciary duties because they failed to outperform the market based solely on their analysis of publicly available information" there cannot, as a matter of law, be a breach of the duty of prudence. *Id.*; *see also Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 426-27 (2014).

The Eighth Circuit extended that same analysis to the plaintiff's contention that the defendants failed to prudently monitor the plan investments.[2] *Id.* at 8. In particular, the court noted that although "an ERISA

---

[2] The Court acknowledges Muri's contention that the Court's previous Memorandum highlights the fact that Muri's duty of prudence allegations include Muri's contention that National Indemnity failed to adequately monitor and investigate the Sequoia Fund's prudence. Filing 127 at 2. But that decision was before *Usenko*. And *Unseko* explicitly applies

13

fiduciary has a continuing duty to monitor trust investments and remove imprudent ones," there must be some "special circumstances undermining the market price" to state a duty of prudence claim based on public information. *Id.* Simply put, following *Usenko*, a plaintiff cannot prevail on a duty of prudence claim by arguing that the Plan fiduciaries failed to act prudently, or failed to adequately monitor the investments in the Plan, by not removing an excessively risky stock "based solely on their analysis of publicly available information." *Id.* at 7-8. (internal quotation omitted).

The similarities between *Usenko* and the underlying litigation cannot be denied. Similar to the fiduciaries in *Usenko*, in this case, National Indemnity relied on publicly available information, including Valeant's market price, Wells Fargo's fund reports, statements from Valeant leadership, and the financial press, when it considered the appropriateness of the Sequoia Fund. *Tibble*, 135 S. Ct. at 1828 (internal quotations removed); *see* filing 77-8 at 2; filing 77-9 at 2; filing 84-17 at 3; filing 27-22 at 1-2; filing 84-20 at 3; Filing 84-23 at 3; filing 84-11 at 6. Nothing in the record, however, suggests that reliance on Valeant's market price or other publicly available information was imprudent under the circumstances.

In fact, like *Usenko*, the evidence is to the contrary: as Valeant's stock price and reports of its questionable acquisition strategy surfaced, the market valuation of Valeant also declined and as a result, the Sequoia Fund's Wells Fargo rating also decreased. And as Valeant's market price declined in value, so did the Sequoia Fund's Wells Fargo rating. This, in turn, prompted the Committee to watch the Sequoia Fund more closely and inform Plan participants of the financial news concerning Valeant. *See* filing 77-8 at 2;

---

the Supreme Court's holding in *Dudenhoeffer* to failure to monitor claims based on public information. Slip op. at 8.

filing 77-9 at 2; filing 84-17 at 3; filing 27-22 at 1-2; filing 84-20 at 3; Filing 84-23 at 3; filing 84-11 at 6.

In sum, contrary to Muri's contentions, National Indemnity was regularly monitoring and discussing Valeant's performance and its impact on the Sequoia Fund, and the Committee reviewed relevant, and most importantly reliable, valuation information. As such, the Court concludes that no reasonable fact finder could find for Muri on his duty of prudence claim. *Usenko*, slip op. at 4-6; *see also Tibble*, 135 S. Ct. at 1828; *Dudenhoeffer*, 573 U.S. at 426-27.

## II. DUTY OF LOYALTY

Next, National Indemnity argues that Muri's duty of loyalty claim fails as a matter of law. The duty of loyalty requires fiduciaries to act "for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A); *Braden v. Wal-Mart Stores*, Inc., 588 F.3d 585, 598 (8th Cir. 2009). This duty is analyzed under a subjective standard where "what matters is why the defendant acted as he did." *In re Wells Fargo ERISA 401(k) Litig.*, 331 F. Supp. 3d 868, 875 (D. Minn. 2018); *see also Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 700 (W.D. Mo. 2019). The test focuses on "the reason" that the fiduciary took the challenged action, and whether it was motivated by "subjective good faith." *Id.* at 875 (emphasis in original).

As noted above, Muri contends that National Indemnity fell victim to conflicts of interest in choosing its investment options, especially those with close relationships to its parent company, Berkshire Hathaway—specifically, because the Sequoia Fund owned Berkshire Hathaway stock. So, to support that claim, Muri must point to evidence from which a reasonable fact finder could infer that the subjective motivation behind the Committee's conduct

15

placed Berkshire Hathaway's interests over those of the Plan participants. *See id.* But here, there is no evidence in the record to support Muri's conclusory allegation that the primary reason for National Indemnity's "retention of the Sequoia Fund in the Plan is that the Sequoia Fund represented a vehicle for Plan participants to invest in the stock of [National Indemnity's] corporate parent, Berkshire Hathaway." Filing 100 at 127.

Instead, the only evidence before the Court is that the Committee was skeptical of removing the Sequoia Fund from the Plan because they did not want to "force participants into liquidating their investments" and wanted "to allow participants to decide based on their individual investment goals whether to continue their investment in [the] Sequoia [Fund] or to liquidate." Filing 84-23 at 4. And to that end, Muri's own expert found that "committee members seem to have believed that the fund's popularity among the participants was an important reason to defer any removal decision." Filing 99-5 at 13. But it is not disloyal for an investment committee to consider what the Plan participants they represent might want. In fact, it simply bolsters the conclusion that the committee members were acting with the participants' interests in mind. *Wildman*, 362 F. Supp. 3d at 702 n.11 (noting committee members' belief that participants preferred active funds).

Nonetheless, Muri argues that keeping the Sequoia Fund, which is allegedly one of the largest shareholders of Berkshire Hathaway, as an investment option may have "elevated the interests of Berkshire Hathaway" to some degree. *See* filing 105 at 127. But what interests were those? The evidence Muri points to indicates only that the Committee considered the opinions of some at Berkshire Hathaway regarding the Sequoia Fund as an investment, *see* filing 105 at 127. But, there is nothing to suggest that any such

16

consideration was intended to benefit Berkshire Hathaway, or that anything the Committee did actually had the effect of benefitting Berkshire Hathaway.

And alternatively, even if it had, "an act which has the effect of furthering the interests of a third party is fundamentally different from an act taken with that as a goal." *Sacerdote v. New York Univ.*, No. 16-CV-6284, 2017 WL 3701482, at \*6 (S.D.N.Y. Aug. 25, 2017), *reconsideration denied*, 2017 WL 4736740 (S.D.N.Y. Oct. 19, 2017); *see also Larson v. Allina Health Sys.*, 350 F. Supp. 3d 780, 804 (D. Minn. 2018). While the former "may well not be a violation of the duty of loyalty, . . . the latter may well be." *Sacerdote*, 2017 WL 370182 at \*6; *Larson*, 350 F. Supp at 804.

And here, Muri has provided the Court with no evidence from which a reasonable fact finder could conclude that the committee's decision to keep the Sequoia Fund can only be explained by an intent to further the interests of Berkshire Hathaway rather than Plan participants. *Sacerdote*, 2017 WL 370182 at \*6, *see Brotherston*, 907 F.3d at 41; *see also Wildman*, 362 F. Supp. 3d at 702.³ Accordingly, the Court will grant National Indemnity's motion for summary judgment on those grounds.

## CONCLUSION

In sum, the evidence before the Court demonstrates that based on the undisputed material facts, Muri's duty of prudence and duty of loyalty claims

---

³ The Court has also noted Muri's suggestion that somehow, a conflict of interest was generated because the Sequoia Fund was "started by former Berkshire Hathaway colleagues and confidantes." Filing 105 at 127. But even assuming that's the case, it does not establish a breach of the duty of loyalty absent evidence of action intended to benefit the Sequoia Fund at the expense of plan participants—and as explained above, there is little to establish that, except the sort of speculation and conjecture that will not suffice to oppose summary judgment. *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 794 (8th Cir. 2012).

17

cannot survive summary judgment. So, the Court will grant National Indemnity's motion in its entirety.

IT IS ORDERED:

1. The defendant's motion for summary judgment (filing 83) is granted.

2. The plaintiff's motion to exclude expert testimony by Samuel E. Bonderoff (filing 79) is denied as moot.

3. The defendant's motion to exclude the expert testimony of Charles Wert (filing 86) is denied as moot.

4. The plaintiff's motion to certify class (filing 70) is denied as moot.

5. A separate judgment will be entered.

Dated this 18th day of June, 2019.

BY THE COURT:

John M. Gerrard
Chief United States District Judge